1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JENNIFER OLIVIA SLOAN, an individual, et al., | CASE NO. 2:25-cv-00020-TL |
| Plaintiff, | ORDER ON MOTION TO DISMISS |
| v. | |
| PORT OF SEATTLE, a municipal corporation, STEPHEN METRUCK, an individual, and KATIE GERARD, an individual, | |
| Defendants. | |

This matter is before the Court on Defendants' Motion to Dismiss for Failure to State a Claim. Dkt. No. 12. Having considered the motion, Plaintiffs' response (Dkt. No. 14), Defendants' reply (Dkt. No. 16), and the relevant record,[1] the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

---

[1] The parties did not request oral argument.

## I.    BACKGROUND

This factual summary is based on Plaintiffs' Second Amended Complaint ("SAC") (Dkt. No. 11) and the documents incorporated therein by reference, including Port policies HR-32, HR-34, and EX-28, Plaintiffs' accommodation requests, accommodation denial letters, temporary accommodation letters, separation letters, and resignation letter. *See United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998–999 (9th Cir. 2011); *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

### A.    The Parties

Defendant Port of Seattle ("the Port") is a municipal corporation of King County, Washington. Dkt. No. 11 ¶ 1.8. During the events giving rise to Plaintiffs' claims, Defendant Stephen Metruck was the Port's Chief Executive Officer, and Defendant Katie Gerard was its Senior Director of Human Resources ("HR"). *Id.* ¶¶ 1.9–1.10.

The Plaintiffs in this case were all Port employees until 2021 or 2022, when their employment ended after they sought, and were denied, workplace accommodations for religiously based objections to the Port's COVID-19 vaccine requirement. At the time of their respective separations from Port employment, Plaintiff Jennifer Olivia Sloan was a Business & Marketing Manager in the Conference Center at Seattle-Tacoma International Airport (*id.* ¶ 3.33), Plaintiff Derek Sloan was a police officer with the Port of Seattle Police Department (*id.* ¶ 3.63), Plaintiff John Hall held the position of Marine Maintenance Project Manager III (*id.* ¶ 3.104), Plaintiff Vetle Strand was a crew chief in the Storm Water Utilities division (*id.* ¶¶ 3.157–158), Plaintiff Michele Fideler was Airport Facilities Manager (*id.* ¶ 3.198), Plaintiff Kelly Wolf was a Senior Administrative Assistant in the Project Management Group (*id.* ¶¶ 3.218–219), and Plaintiff Gail Abe was a Mechanic and automotive apprentice in the Marine Maintenance Department (*id.* ¶¶ 3.239–240).

### B.    Factual Background

#### 1.    The COVID-19 Pandemic and the Workplace Disruption at the Port

In 2020, "COVID-19, an infection caused by the novel zoonotic coronavirus SARS-CoV-2 . . . bec[a]me a global pandemic." *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1232–33 (W.D. Wash. 2020). By March of that year, COVID-19's "rampant spread" had compelled federal, state, and local governments to take such "drastic actions" as "institut[ing] 'stay home' orders" and "implement[ing] widespread 'social distancing measures.'" *Id.* at 1233.

During the COVID-19 pandemic, the Port of Seattle implemented temporary policies referred to as "workplace disruptions." Dkt. No. 11 ¶ 3.39. The Port paused certain non-essential operations, allowed some employees to work remotely, and adjusted workloads and schedules to avoid layoffs. *Id.* ¶¶ 3.40–42. Protocols requiring masking and social distancing were put into place for employees when they were present at Port facilities in person. *Id.* ¶ 3.42. The Port also implemented policies around quarantining and reporting for employees to follow if they contracted or were exposed to COVID-19. *See id.* ¶¶ 3.43, 3.248.

During the workplace disruption, Plaintiff **J. Sloan**,[2] who had regularly worked remotely one or two days each week prior to the pandemic, was able to work fully remotely, although she did have to visit the office occasionally. *Id.* ¶¶ 3.39, 3.42. Although the Conference Center she typically co-managed was closed for part of that time, she completed all her duties and took on additional projects when Conference Center operations were paused. *Id.* ¶¶ 3.35, 3.40, 3.43.

Plaintiff **D. Sloan** began his basic training as a Port police officer in January 2020 and started at the police academy in February 2020. *Id.* ¶ 3.64. When the academy shut down for a few months, he studied from home and occasionally returned to the police department for

---

[2] Because Plaintiffs Jennifer Olivia Sloan and Derek Sloan share a surname, the Court refers to them each with an initial, following the convention used in the SAC. *See generally* Dkt. No. 11.

training. After classes resumed at the academy, Plaintiff D. Sloan studied in person, graduated in July 2020, and then worked in person for the remainer of his employment at the Port. *Id.* ¶¶ 3.66, 3.71.

As a Project Manager in the Marine Maintenance Department, **Plaintiff Hall** was responsible for conducting site visits and team meetings, coordinating on-site work with in-house and contractor crews, meeting with project sponsors, and conducting on-site inspections. *Id.* ¶ 3.106. His job during the workplace disruption involved both remote work from home via computer and significant on-site duties across various Port properties. *Id.* ¶¶ 3.105–106.

**Plaintiff Strand** was an experienced plumber whose work as a crew chief in Storm Water Utilities involved designing and implementing storm water treatment systems. *Id.* ¶¶ 3.156, 3.163. He was required to work in person every day, including during the workplace disruption. *Id.* ¶ 3.165.

**Plaintiff Fideler** worked at least partly remotely during the workplace disruption, managing a team as part of the Conference Center. *Id.* ¶ 3.205. Plaintiff Fideler had developed the Conference Center business during her twenty-five years working at the Port. *Id.* ¶¶ 3.189, 3.200.

**Plaintiff Wolf**, who was on maternity leave until March 2020, never returned to in-person operations and performed her job fully remotely for the rest of her employment with the Port. *Id.* ¶ 3.222. Plaintiff Wolf was granted continued work-from-home privileges as others returned to the office due to the lack of available childcare during the pandemic. *Id.* ¶ 3.223.

**Plaintiff Abe**'s work during the workplace disruption was entirely in person. When she was exposed to COVID-19 and subsequently spent three months at home with a cough, there was no work she could complete remotely. *Id.* ¶¶ 3.248–249.

1

2

### 2. The Port's Vaccination Policy and Plaintiffs' Accommodation Requests

3

After the first COVID-19 vaccines became available, the Port implemented a policy

4 allowing vaccinated employees to choose not to wear masks at work. *Id.* ¶ 3.4 Unvaccinated

5 employees were still required to wear masks at work. *Id.* This Policy was known as HR-32. Dkt.

6 No. 13 (Philips Decl. and Exhibits) at 10–14 (HR-32 as of 7/1/2021). Plaintiffs complied with

7 the mask mandate and other COVID-19-related protocols. Dkt. No. 11 ¶¶ 3.42–43, 3.72, 3.252.

8

In September 2021, the Port imposed a vaccination requirement for its employees, in a

9 policy known as HR-34. *Id.* ¶ 3.44. HR-34 made vaccination against COVID-19 a condition of

10 employment, with provisions for religious or medical exemptions. *Id.* The stated purposed of

11 HR-34 was to "safeguard the health and well-being of employees and their families, the

12 community, visitors, and others who spend time in [Port] facilities from COVID-19's infectious

13 conditions that can be reduced through an effective employee vaccination requirement program."

14 *Id.* ¶ 3.13.

15

HR-34 informed Port employees:

16

> To assist any employee who has either: (a) an underlying medical
> condition or disability that contraindicates administration of the
17 > COVID-19 vaccine, or (b) an objection based upon a sincerely
> held religious belief, the Port of Seattle may provide exemption
18 > from the vaccination requirement and engage in an interactive
> process to determine if a reasonable accommodation can be
19 > provided so long as it does not create an undue hardship for the
> Port of Seattle or does not pose a direct threat to the health or
20 > safety of others in the workplace and/or to the employee. . . .

21

> After receipt of an employee's request for exemption, Human
> Resources will review the  documentation submitted and, if the
22 > request is approved for further processing, will engage in the
> interactive process with the employee to clarify the nature of the
23 > request, determine exemption eligibility, and identify potential
> reasonable accommodations (with assistance from  the employee's
24 > supervisor). Accommodations maybe [*sic*] granted where they do

> not create an undue hardship for the Port of Seattle and/or do not
> pose a direct threat to the health or safety of others in the
> workplace and/or to the employee.

Dkt. No. 13 at 29 (HR-34 as of 9/14/2021). Defendant Gerard was allegedly responsible for

deciding whether individual accommodations would be granted. Dkt. No. 11 ¶ 3.8.

All seven Plaintiffs submitted exemption and accommodation requests based on religious

objections to receiving COVID-19 vaccination. *Id.* ¶ 3.2; *see* Dkt. No. 13 at 45–91 (Religious

Accommodation/Exemption Request Forms). Plaintiffs J. Sloan, D. Sloan, Hall, and Wolf

attended evangelical Christian churches. *Id.* ¶¶ 3.47, 3.75, 3.116, 3.228. Plaintiffs Strand,

Fideler, and Abe attend non-denominational Christian churches. *Id.* ¶¶ 3.180, 3.208, 3.255.

Plaintiffs allege that their churches or denominations all have beliefs against abortion and that

Plaintiffs "shared the belief that the way in which the vaccination was developed (i.e., with the

use of aborted fetal cells and/or as an mRNA gene therapy) was strongly opposed to their

religious beliefs." *Id.* ¶¶ 3.3, 5.3–5.5. "Plaintiffs also believe that their bodies are temples, that

God gives them answers to prayers about what to put in their bodies and has the power to heal

them." *Id.* ¶ 3.3. In the exemption and accommodation requests they submitted to Defendants,

some Plaintiffs identified themselves as Christians, and some did not. *See* Dkt. No. 13 at 45–91.

Some Plaintiffs identified abortion-related beliefs as driving their opposition to COVID-19

vaccination, in whole or part, while others asserted religious (and non-religious) objections

unrelated to abortion. *See id.*

In October 2021, Defendant Gerard issued letters to all Plaintiffs, informing them that

their requests for religious exemption has been received, that the Port did not dispute that their

requests were based on sincere religious beliefs, and that "the next step of the process involve[d]

an analysis of whether an unvaccinated employee in [each] position c[ould] be accommodated in

the workplace without imposing an undue hardship on the Port." Dkt. No. 13 at 93, 95, 97, 99,

102, 104, 106. The letters received by Plaintiffs D. Sloan, Strand, Fideler, and Abe, which were

dated October 14, 2021, went on to inform them:

> After review of your Religious Exemption Request and
> information provided from your manager concerning the essential
> core functions of your position, the Port finds that granting your
> accommodation request would pose an undue hardship on the Port
> by negatively impacting workplace safety and posing a threat to
> the health and safety of employees and their families, the
> community, visitors, and others who spend time in Port facilities.

*Id.* at 94, 96, 98, 100. These Plaintiffs were given until November 16, 2021, to come into

compliance with the vaccination requirement. If they still remained unvaccinated, they could

resign at that time; otherwise, their employment would be terminated. *Id.* at 94, 96, 98, 100.

None of these Plaintiffs decided to become vaccinated. Plaintiffs Abe, D. Sloan, and

Strand were terminated from Port employment between November 16 and November 18, 2021.

Dkt. No. 13 at 116, 120, 124 (letters of separation). Plaintiff Fideler reached an agreement with

the Port to take early retirement, and her employment ended in January 2022. *Id.* at 118; Dkt.

No. 11 ¶ 3.210.

Plaintiffs Hall, J. Sloan, and Wolf all had positions that they performed fully or partly

remotely during the early days of the COVID-19 "Workplace Disruption" at the Port. Each of

these employees was informed, in a letter dated October 25, 2021:

> After review of your Religious Exemption Request and information
> provided from your manger concerning the essential core functions
> of your position, the Port will grant a temporary exemption until the
> end of the Workplace Disruption, December 31, 2021.
>
> Your temporary accommodation will be re-evaluated prior to the
> end of the year. While your temporary accommodation is in place,
> as a Port Employee, you are ineligible from being at any Port work
> locations, construction sites or participating in any "in-person"
> Port events. You may participate in any virtual Port functions and
> will have the same level of access to Port locations as the General
> Public.

*Id.* at 102, 104, 106.

1    None of these Plaintiffs decided to become vaccinated.

2    Plaintiff Hall believed the restrictions on his access to Port property outlined in the

3    October 25, 2021, letter were discriminatory. Dkt. No. 11 ¶ 3.120. He felt professionally

4    marginalized as he was unable to perform in-person responsibilities. *Id.* ¶ 3.134. When a meeting

5    was scheduled to discuss his accommodations with Port HR, Plaintiff Hall believed the purpose

6    of the meeting was to terminate him. *Id.* ¶ 3.150. On December 2, 2021, Plaintiff Hall addressed

7    a letter of resignation to his supervisor, informing the Port that Plaintiff Hall was resigning

8    effective December 13, 2021. Dkt. No. 13 at 109 (letter of resignation).

9    On December 17 and December 20, 2021, respectively, Plaintiffs Wolf and J. Sloan were

10   informed that "review of [their] essential functions with [their] manager[s] reflect[ed] that certain

11   job responsibilities need[ed] to be performed onsite," and that their temporary telework

12   accommodations were not being renewed past December 31, 2021. Dkt No. 13 at 110–14 (letters

13   denying permanent accommodations). Both were terminated from Port employment effective

14   January 10, 2022. *Id.* at 122, 126 (letters of separation).

15   **C.      Procedural History**

16   In July 2023, Plaintiff Hall filed a lawsuit against the same Defendants in this lawsuit,

17   asserting claims for failure to accommodate religious beliefs and religious discrimination under

18   Title VII, as well as violation of his First Amendment rights. *See generally* Complaint*, Hall v.*

19   *Port of Seattle*, No. C23-1067 (W.D. Wash. July 17, 2023), Dkt. No. 1. The claims in *Hall*

20   similarly arose out of the Port's vaccine mandate, Hall's request for a religious accommodation,

21   and the end of his employment by the Port. *See generally id*. In January 2024, the Honorable

22   David W. Christel, United States Magistrate Judge, granted Defendants' motion for judgment on

23   the pleadings, dismissing all of Hall's claims without prejudice and without leave to amend. *See*

24

1    *generally* Order on Motion for Judgment on the Pleadings, *Hall v. Port of Seattle*, No. C23-1067

2    (W.D. Wash. Jan. 30, 2024), Dkt. No. 26.

3        Plaintiffs filed this lawsuit on January 6, 2024. Dkt. No. 1. Plaintiffs have amended their

4    complaint once as a matter of right (Dkt. No. 3) and once with Defendants' consent (Dkt. No. 11;

5    *see* Dkt. No. 10). The operative complaint brings five claims against the Port of Seattle:

6    (1) failure to accommodate religious beliefs under the Washington Law Against Discrimination

7    ("WLAD"), Chapter 49.60 RCW; (2) religious discrimination–disparate impact under the

8    WLAD; (3) religious discrimination–disparate treatment under the WLAD; (4) violation of the

9    right to privacy under Washington law; and (5) violation of the Free Exercise Clause of the First

10   Amendment, a claim brought under 42 U.S.C. § 1983. Dkt. No. 11 at 41–48. Certain Plaintiffs

11   also assert a § 1983 claim against Defendants Metruck and Gerard. *See id.* at 46–48. Defendants

12   now move for dismissal of Plaintiff Hall's failure-to-accommodate claim, as well as all

13   Plaintiffs' disparate impact, disparate treatment, right to privacy, and Free Exercise claims.[3]

## II.    LEGAL STANDARD

15       A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief

16   can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the

17   Court takes all well-pleaded factual allegations as true and considers whether the complaint

18   "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

19   (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare

20   recitals of the elements of a cause of action, supported by mere conclusory statements," are

21   insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content

---

[3] The Port does not move to dismiss Plaintiffs' claims for failure to accommodate under the WLAD, except for Plaintiff Hall's claim. *See* Dkt. No. 12 at 9. A Free Exercise claim under § 1983 is only asserted by Plaintiffs J. Sloan and Wolf. Dkt. No. 11 at 46.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. Dismissal is also appropriate "based on the lack of a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When reviewing a dismissal pursuant to Rule 12(b)(6), "we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[], the non-moving party." *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

## III.    DISCUSSION

## A.    Claims Under the Washington Law Against Discrimination

The WLAD creates a cause of action for employees against employers who discriminate against them because of protected characteristics, including religion. RCW 49.60.030(1)(a), 49.60.030(2). Plaintiffs have brought three claims under the WLAD: failure to accommodate their religious beliefs (Claim One), disparate impact (Claim Two), and disparate treatment (Claim Three). Dkt. No. 11 ¶¶ 4.1–7.12. Defendants move for dismissal of all three claims as to Plaintiff Hall and of Claims Two and Three as to all Plaintiffs.

As related to religious discrimination, the WLAD is substantially the same as Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and "[f]or help interpreting the WLAD," courts may "look to cases applying Title VII's prohibition against religious discrimination." *See Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 496, 325 P.3d 193 (2014).

### 1.    Claim One: Failure to Accommodate (Plaintiff Hall)

As a threshold matter, any Plaintiff asserting WLAD claims for failure to accommodate religious beliefs must show that they have suffered an adverse employment action. *See Kumar*,

180 Wn.2d. at 501; *Marin v. King County*, 194 Wn. App. 795, 808, 378 P.3d 203 (2016).[4] An "[a]dverse employment action means a tangible change in employment status, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Crownover v. State ex rel. Dep't of Transp.*, 165 Wn. App. 131, 148, 265 P.3d 971 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Plaintiff Hall is the only Plaintiff here who was not actually terminated by the Port of Seattle (or allowed to retire in lieu of termination); he resigned from his position before a meeting was held to reevaluate his temporary accommodations. Dkt. No. 11 ¶¶ 3.139, 3.148.

Plaintiff Hall argues that he suffered an adverse employment action because he was constructively discharged from the Port. Dkt. No. 14 at 14–19. "To establish constructive discharge, an employee must show that an employer engaged in a deliberate act, or a pattern of conduct, that made working conditions so intolerable that a reasonable person would have felt compelled to resign." *Barnett v. Sequim Valley Ranch, LLC*, 174 Wn. App. 475, 485, 302 P.3d 500 (2013) (citing *Sneed v. Barna,* 80 Wn. App. 843, 849–50, 912 P.2d 1035, *review denied,* 129 Wn.2d 1023, 919 P.2d 600 (1996)). By contrast, a resignation is voluntary (and not a constructive discharge) "when an employee abandons the employment because of a desire to leave, including such a desire motivated by a dissatisfaction with working conditions." *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 638, 700 P.2d 338 (1985). Constructive discharge "is an objective standard and an 'employee's subjective belief that he had no choice but to resign is irrelevant.'" *Barnett*, 174 Wn. App. at 485 (quoting *Travis v. Tacoma Pub. Sch. Dist.,* 120 Wn. App. 542, 551, 85 P.3d 959 (2004)).

---

[4] This rule, and accordingly all analysis in this subsection, also applies to Plaintiff's disparate treatment and disparate impact claims. *See Marin v. King County*, 194 Wn. App. 795, 808, 378 P.3d 203 (2016); 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 330.02 (7th ed.).

As Defendants point out, Judge Christel already conducted a thorough analysis of whether Plaintiff Hall was constructively discharged in Hall's prior case, determined that he was not, and granted judgment on the pleadings in Defendants' favor. Dkt. No. 12 at 12, 15; *see generally* Order on Motion for Judgment on the Pleadings, *Hall v. Port of Seattle*, No. C23-1067, Dkt. No. 26. While Judge Christel dismissed Plaintiff Hall's claims without prejudice, he denied leave to amend, finding that "amendment would be futile because the 'underlying facts' do not 'provide proper grounds for relief,' and the Court [could] not 'conceive of facts that would render' Plaintiff's claims 'viable.'" *Id.* at 19 (quoting *Balistreri*, 901 F.2d at 701). Nonetheless, in this action, Plaintiff Hall has alleged the same violations, based on the same facts, this time under the WLAD.

Plaintiff Hall asserts that "Magistrate Judge Christel did not consider evidence contained in a declaration for Hall to support his complaint, evidence contained in Hall's SAC." Dkt. No. 14 at 12. The Court construes this statement as an attempt to distinguish the two complaints.[5] However, Plaintiff Hall does not indicate which facts alleged in the SAC, but absent from his Complaint in *Hall,* would impact the adverse employment action analysis. *Id.* Although "the Court recognizes that it is not obligated 'to scour the record' for a potential basis to deny the . . . motion to dismiss," the Court has nonetheless carefully compared the two complaints. *Langlois v. United States*, No. C08-43, 2008 WL 4104432, at *2 (D. Mont. Sept. 3, 2008) (quoting *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir. 1996)).

The SAC includes few factual allegations related to Plaintiff Hall that were not considered by Judge Christel, and none that would establish a constructive discharge or other

---

[5] If instead (or in addition) Plaintiff Hall attempts to allege that Judge Christel erred in disregarding his declaration, Plaintiff Hall is incorrect, as the declaration in question, filed in support of his response in opposition to judgment on the pleadings, was improper. Order on Motion for Judgment on the Pleadings, *Hall v. Port of Seattle*, No. C23-1067, ECF No. 26; *see Schneider v. California Dep't. of Corr.* 151 F.3d 1194, 1197, n.1 (9th Cir 1998) (new allegations raised in a plaintiff's opposition papers are irrelevant for Rule 12(b)(6) purposes).

adverse employment action. *Compare* Dkt. No. 11, *with* Complaint, *Hall v. Port of Seattle*, No. C23-1067, Dkt. No. 1. Plaintiff Hall newly alleges that he "is aware from documentation generated by the Port that they were not going to extend his temporary accommodation past December 31, 2021." Dkt. No. 11 ¶ 3.151. However, impending termination does not amount to an intolerable condition or otherwise evidence a constructive discharge before an actual discharge has occurred. *See, e.g., Atwood v. Consol. Elec. Distribs., Inc.*, 231 F. App'x 767, 769 (9th Cir. 2007) ("The mere fact that Atwood felt that his termination was inevitable is not enough to reach a constructive discharge."). New allegations that a "colleague pointedly asked Plaintiff Hall if he was vaccinated" (Dkt. No. 11 ¶ 3.114), and that Plaintiff Hall's supervisor had invested in pharmaceutical companies and believed "that to end the pandemic, it would take a vaccine" (*id.* ¶ 3.142–143) do not sufficiently support Plaintiff Hall's conclusory allegation of a "hostile work environment" (*id.* ¶ 3.126) or intolerable conditions. Allegations that some or even many people elsewhere in the world were angry that others chose not to become vaccinated also does not plausibly establish that anyone at Defendants' workplace shared these views, much less that they treated Plaintiff Hall with hostility. *See* Dkt. No. 11 ¶¶ 3.25–3.31; Dkt. No. 14 at 18. Nor can Plaintiff Hall's speculation that coworkers were not accommodated (*id.* ¶ 3.131), or that his supervisor "was working against Plaintiff Hall being accommodated" (*id.* ¶ 3.144), change the facts that Plaintiff Hall *was* temporarily accommodated (*id.* ¶ 3.18); that some employees with religious vaccine exemptions were permanently accommodated (*id.* ¶ 3.10); and that it was Plaintiff Hall, not Defendants, who opted out of the accommodation process before a final decision could be reached as to whether his accommodation would be continued (*id.* ¶ 3.148). *See E.E.O.C. v. AutoNation USA Corp.*, 52 F. App'x 327, 329 (9th Cir. 2002) (holding that an employee who resigned "while discussions regarding potential accommodations were ongoing

and in their early stages, violated his correlative duty to make a good faith attempt to satisfy his needs" and could not sustain a failure-to-accommodate claim).

Furthermore, Plaintiff Hall's dissatisfaction with the accommodation that he was provided does not render his working conditions intolerable. *See U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110–11 (9th Cir. 2010) (employer is not obligated to select employee's preferred accommodation); *see also Simpson v. DeJoy*, 641 F. Supp. 3d 772 (D. Ariz. 2022) ("Even if Simpson disliked the terms of his employment (*e.g.*, the altered schedule or time spent working outside of business hours), there is no evidence that his working conditions were 'intolerable' or 'discriminatory.'"). In the COVID-19 context, courts have found (and this Court agrees) that workplace safety measures that separate an unvaccinated employee from others at the height of of the pandemic do not constitute discriminatory treatment to support a Title VII claim. *See Penna v. N. Clackamas Sch. Dist.*, No. C22-1417, 2023 WL 6003834, at *2 (D. Or. Aug. 11, 2023); *Breshears v. Oregon Dep't of Transp.*, No. C22-1015, 2023 WL 136550, at *3 (D. Or. Jan. 9, 2023). This is true *even if* the separation results in harassment from coworkers—which Plaintiff hall does not sufficiently allege. *Bottman v. Springfield Pub. Sch.*, No. C22-1900, 2024 WL 3400101, at *5–6 (D. Or. July 12, 2024). Although Plaintiff Hall's allegations refer to several conversations about COVID-19 vaccination that likely made him anxious or uncomfortable (*see* Dkt. No. 11 ¶¶ 3.114, 3.125, 3.127–128, 3.29)—he does not in fact describe any actions taken by coworkers or employers that could be fairly characterized as harassment. Moreover, the fact that other employees subjected to the same policies and work environment did not resign—including all six of Hall's Co-Plaintiffs, clearly establishes that, even if "Plaintiff Hall felt forced to resign" (Dkt. No. 11 ¶ 3.148), this "subjective belief" does not meet the "objective standard" for intolerable conditions. *Barnett*, 174 Wn. App. at 485. The

claim that Plaintiff Hall experienced a "forced resignation" on December 2, 2021, simply does not match the facts that he has pleaded. Dkt. No. 11 ¶3.148, 3.152.

For all these reasons, Plaintiff Hall's WLAD claims are indistinguishable from his Title VII claims and thus suffer the same fatal flaw. The Court adopts in full the reasoning of Judge Christel's order dismissing *Hall v. Port of Seattle* and DISMISSES WITH PREJUDICE Plaintiff Hall's WLAD claims. No. C23-1067, Dkt. No. 26.

### 2.    Claims Two and Three: Disparate Impact and Treatment Under the WLAD (All Plaintiffs)

To establish a disparate treatment claim under the WLAD, a plaintiff must demonstrate a prima facie case by showing that: (1) they belong to a protected class, (2) they suffered an adverse employment action, (3) they were treated less favorably in the terms or conditions of their employment (4) than a similarly situated employee outside their protected class who was doing substantially the same work. *Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 24, 408 P.3d 1123 (2017); *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 226–27, 907 P.2d 1223 (1996); *Marin*, 194 Wn. App. at 808; *Matson v. United Parcel Serv., Inc.*, 872 F. Supp. 2d 1131, 1137 (W.D. Wash. 2012). Similarly, to establish a prima face case of disparate impact under the WLAD, a plaintiff must prove (1) a facially neutral employment practice (2) falls more harshly on a protected class. *Oliver v. Pac. Nw. Bell Tel. Co., Inc.*, 106 Wn.2d 675, 679, 724 P.3d 1003 (1986) (citing, *inter alia*, *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 727, 709 P.2d 799 (1985), *abrogated on other grounds by Blair v. Washington State Univ.*, 108 Wn.2d 558, 740 P.2d 1379 (1987); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 349 (1977)). This means that, as a threshold requirement of their disparate treatment and disparate impact claims, Plaintiffs must plausibly plead membership in a protected class or group.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### a) *Disparate Treatment*

Plaintiffs first allege that they are "members of a protected class as people with religious beliefs." Dkt. No. 11 ¶¶ 5.2. But this group is vastly overinclusive. To establish the first prima facie element of a claim of disparate impact or treatment based on a religious belief, a plaintiff must plausibly allege that other members of the religious group share the same underlying belief. *Bolden-Hardge v. Off. of the Cal. State Controller*, 63 F.4th 1215, 1228 (9th Cir. 2023). Plaintiffs do not and cannot plausibly plead facts supporting that all "people with religious beliefs" are opposed to COVID-19 vaccination. Even had Plaintiffs limited their class to their single, shared religion, they do "not allege that all Christians oppose vaccines or that non-vaccination is inherent in Christian beliefs." *Strandquist v. Washington State Dep't of Soc. & Health Servs.*, No. C23-5071, 2024 WL 4645146, at *14 (W.D. Wash. Oct. 31, 2024), *reconsideration denied,* 2024 WL 4979859 (Dec. 4, 2024); *see also Small v. Oregon Health & Sci. Univ.*, No. 23-1290, 2024 WL 4137484, at *5 (D. Or. Aug. 5, 2024) ("[T]o the extent plaintiffs assert a 'protected class on the basis of their devout and sincerely held religious beliefs in the tenants of Christianity,' it is clear . . . that there is a wide range of belief subsets within that religion."), *report and recommendation adopted,* 2024 WL 4136263 ( Sept. 9, 2024). In fact, Plaintiffs do not clearly allege all or even many evangelical or non-denominational Christians hold beliefs against COVID-19 vaccination. Rather, they simply allege that their congregations espouse beliefs against abortion, and that they themselves hold beliefs against COVID-19 vaccination. Plaintiffs' assertions that they "have alleged that their religious beliefs, shared by their respective religious affiliations, are strongly against abortion [such that they] are required to refuse any product created through the use of aborted fetal cells," and that "[e]ach Plaintiff has pled their religious congregation or affiliation would be implicated" neither remedy this defect

nor accurately represent the allegations contained in their complaint. Dkt. No. 14 at 20–21; *see generally* Dkt. No. 11.

Plaintiffs' attempt, in the alternative, to define "a protected class of those with Christian religious beliefs against the COVID-19 vaccination" fares no better. Dkt. No. 11 ¶ 5.6. "Opposition to a vaccine, even when labeled as a religious belief, is not enough to establish a protected class." *Matthews v. Legacy Health*, No. C24-592, 2024 WL 3970794, at *3 (D. Or. Aug. 26, 2024). "Title VII," and, therefore, the WLAD, "protects individuals of a specific faith or religious subgroup who hold a *consistent and defining set of beliefs* at odds with an employment requirement," not "individuals who hold any religious-based objection" to a vaccination policy (or other workplace rule). *Boltz v. PeaceHealth*, No. C24-246, 2025 WL 552582, at *3 (D. Or. Feb. 19, 2025) (emphasis added); *see also Brown v. Alaska Airlines, Inc.*, No. C22-668, 2024 WL 2325058, at *17 (W.D. Wash. May 22, 2024) ("[T]o the extent that Plaintiffs intend their claim to relate to a custom-tailored subgroup of Christians based upon beliefs . . . they have failed to define the kind of group that a Title VII disparate impact claim is designed to protect.").

Even assuming Plaintiffs have adequately pleaded the first element of their prima facie case, the SAC does not contain sufficient allegations that similarly situated employees outside their group were treated differently under the Port's vaccine mandate. Plaintiffs do not plausibly allege that unvaccinated Port employees who did *not* hold religious beliefs were permitted to continue working onsite, or that non-religious or non-objecting employees were given permanent, fully remote accommodations for substantially identical positions as those that Plaintiff held. *See Small*, 2024 WL 4137484, at *5 (dismissing the plaintiffs' disparate treatment and disparate impact claims under analogous circumstances); *Gage v. Mayo Clinic*, 707 F. Supp. 3d 870, 883 (D. Ariz. 2023) (same as to disparate treatment, finding "Plaintiff only alleges that

1    vaccinated employees were treated more favorably than unvaccinated employees because

2    unvaccinated employees were subject to additional measures to prevent the spread of

3    COVID-19. Plaintiff has not alleged facts sufficient to suggest that this amounts to disparate

4    treatments of Christians, or more favorable treatment of non-Christians.") *aff'd,* No. 23-4410,

5    2025 WL 1733503 (9th Cir. June 23, 2025).

6        Plaintiffs' attempts to identify a comparator class fail. Plaintiffs first allege that

7    "Plaintiffs were treated less favorably than similarly situated unvaccinated employees who

8    requested a medical exemption." Dkt. No. 11 ¶ 7.9. But this allegation lacks foundation. First,

9    there are no specific allegations that unvaccinated, non-religious employees with similar duties

10   received medical accommodations and were permitted to continue working onsite or otherwise

11   remain employed indefinitely. Second, "nothing indicates that seeking a medical exception is

12   'similar conduct' to seeking a religious exception." *Thompson v. Asante Health Sys.*,

13   No. C23-486, 2023 WL 7348812, at *7 (D. Or. Sept. 21, 2023) ("With legally separate and

14   distinct standards by which employers are evaluated for proper accommodation, then, these

15   categories of employees are not 'similarly situated.'"). Similarly, as Defendant points out,

16   Plaintiffs' allegations regarding workers employed by contractors do not establish a comparator

17   class for this claim because those workers are not similarly situated to Port employees. Dkt.

18   No. 12 at 19; *see, e.g., Dollar v. Goleta Water Dist.*, No. C22-3723, 2022 WL 5176904, at *5

19   (C.D. Cal. Oct. 3, 2022) (concluding, with respect to equal protection claim, that contractors

20   were not similarly situated to employees). Finally, Plaintiffs' assertion that "vaccinated

21   employees with materially similar jobs were allowed to work remotely" (Dkt. No. 11 ¶ 3.25) is a

22   "[t]hreadbare recital" that lacks apparent foundation and merely restates elements of the rule,

23   which is not sufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678.

24

b)    *Disparate Impact*

Plaintiffs' disparate impact claim fails for the same reason as their disparate treatment claim. "[C]ourts generally treat disparate impact claims as those affecting particular groups or faiths, including articulable sub-groups, but not all those who share a single common belief." *Dunbar v. Walt Disney Co.*, No. C22-1075, 2022 WL 18357775 at *3 (C.D. Cal. July 25, 2022); *see also Cox v. Nw. Reg'l Educ. Serv. Dist.*, No. C22-1073, 2024 WL 777598, at *14 (D. Or. Feb. 23, 2024) ("[P]arties cannot establish a prima facie disparate impact claim by defining the group as comprised of religious individuals holding a particular belief they attribute to their religion even if other members of that individual's faith or religious group believe otherwise."); This claim in particular highlights the necessity of rejecting claims for classes defined by particular beliefs: "allowing disparate impact claims for groups holding a particular religious belief would give 'limitless relief' because 'any policy impacting a plaintiff's specific religious belief would generally impact 100% of the members of a class defined by that belief, which would virtually always amount to a disproportionate impact as compared to those falling outside the class.'" *Cox*, 2024 WL 777598, at *13. Put differently, any policy with any consequence for non-compliance will always inherently disproportionately impact its objectors, but that alone is not a basis for liability.[6] Objectors, even religious objectors, are not a protected class.

\*       \*       \*

As Plaintiffs have not pleaded and cannot plead that they belong to a protected class, the Court finds that Plaintiffs have not stated a plausible claim of either disparate treatment or disparate impact under the WLAD. These claims are therefore DISMISSED WITH PREJUDICE.

---

[6] Plaintiffs themselves highlight the danger of this approach by asserting that "each Plaintiff forms their own protected class . . . ." Dkt. No. 14 at 21. Contrary to Plaintiffs' implication (*see id.*), this approach was not endorsed by the Court of Appeals in *Bolden-Hardge v. Office of the Cal. State Controller*, 63 F.4th 1215, 1228 (9th Cir. 2023), and it cannot be the rule. Beyond the obvious fairness concerns, this interpretation would seem to render WLAD failure-to-accommodate superfluous, as any workplace requirement that conflicts with an employee's religious practice would always already violate the WLAD by disparately impacting an objector class of one.

**B.    Claim Four: Violation of the Right to Privacy (Plaintiffs Hall and D. Sloan)**

In their complaint, all Plaintiffs assert a claim for violation for the right to privacy under both Article I, Section 7, of the Washington State Constitution and Washington common law. Dkt. No. 11 ¶¶ 8.2, 8.3.  In their response to Defendants' motion to dismiss, Plaintiffs clarify that this is a common-law claim only, and that Plaintiffs Fideler, Strand, Wolf, Abe, and J. Sloan have decided to dismiss their privacy claims. Dkt. No. 14 at 27. Accordingly, this claim is asserted only by Plaintiffs Hall and D. Sloan, who will be will be referred to as "Plaintiffs" for the purpose of this claim.

The relevant tort under Washington common law is for invasion of privacy by publication. *See* Dkt. No. 12 at 22 (construing Plaintiffs' claim thus); Dkt. No. 14 at 28–31. To establish a claim for invasion of privacy based upon public disclosure of private facts, a plaintiff must establish (1) the defendant gave publicity in a matter concerning the private life of the plaintiff; and (2) the matter publicized is a kind that (a) would be highly offensive to a reasonable person, and (b) is not a legitimate concern to the public. *White v. Township of Winthrop*, 128 Wn. App. 588, 594, 116 P.3d 1034 (2005) (citing *Reid v. Pierce County*, 136 Wn.2d 195, 205, 961 P.2d 333 (1998)); *accord Doe v. U.S. Ctr. for SafeSport, Inc.*, No. C23-6067, 2024 WL 3924663, at *11 (W.D. Wash. Aug. 23, 2024).

Plaintiffs allege that the Port publicized a private fact about them—specifically their unvaccinated status—when it implemented a policy allowing vaccinated employees, but not unvaccinated employees, to work without wearing masks, and informed the public of this policy. Dkt. No. 11 ¶¶ 8.4, 8.5. "In so doing," Plaintiffs allege, "Defendant disclosed through their policies and dissemination of their reasoning for said policies, private health information about each staff member, including Plaintiffs." *Id.* ¶ 8.6. Plaintiffs allege that "the disclosure of their unvaccinated status was highly offensive because of the extreme negative view of unvaccinated

1   individuals that existed in King County at the time" and that the policy (and thus the alleged

2   disclosure) lacked justification, "as the Port was well aware that even vaccinated individuals

3   could still infect other people with COVID-19." *Id.* ¶¶ 8.10, 8.11.

4          Plaintiffs' claim fails because they have not plausibly pleaded that any disclosure

5   occurred. Although they claim that, "[b]y July 2021," the mask policy made them "easily

6   identifiable and subject to discrimination and harassment," no Plaintiff alleges that they were

7   actually identified as unvaccinated.[7] It does not appear possible that the enactment and

8   publication of HR-32 could have caused anyone to know that a masked Port employee was

9   unvaccinated, since it was clear that while unvaccinated employees were required to mask in

10  July 2021, vaccinated employees could choose to mask or not mask. *See* Dkt. No. 13 at 10.

11  Vaccinated employees might have chosen to wear masks for any number of reasons, and

12  Plaintiffs do not allege that this did not happen. On the contrary, Plaintiffs' own allegation that

13  "many employees, including some of Plaintiff D. Sloan's coworkers, took advantage of" the

14  opportunity to unmask suggests that others chose to remain masked. Dkt. No. 11 ¶ 3.75. To the

15  extent that the mask policy may have led employees or others to *suspect* that any Plaintiff was

16  unvaccinated, Plaintiffs point to no authority that workplace policies that support circumstantial

17  inferences about employees' private health information constitute "disclosure," and the Court is

18  aware of none. In any case, Plaintiffs have not clearly alleged that anyone was caused even to

19  suspect their unvaccinated status.

20         As Plaintiffs have not pleaded facts supporting any publication of their private facts, the

21  Court need not consider whether the alleged publication was highly offensive or of legitimate

22  public concern. This claim is DISMISSED WITH PREJUDICE.

23

24  _____

[7] Though less relevant to the analysis of this claim, Plaintiffs also do not allege any actions by coworkers that would
qualify as discrimination or harassment.

**B.      Claim Five: Violation of the Free Exercise Clause (Plaintiffs J. Sloan and Wolf)**

Plaintiffs J. Sloan and Wolf ("Plaintiffs" for the purpose of this claim) assert a claim

under 42 U.S.C. § 1983, alleging that the Port burdened their free exercise of religion in violation

of the First Amendment to the U.S. Constitution. Dkt. No. 11 ¶¶ 9.1–9.12. Plaintiffs also assert

this claim against Defendants Metruck and Gerard in their individual capacities. *Id.* ¶¶ 9.6, 9.7.

Defendants move for dismissal of this claim pursuant to Rule 12(b)(6). Dkt. No. 12 at 6.

The Free Exercise Clause "protect[s] religious observers against unequal treatment"

based on their "religious status" by barring laws "prohibiting the free exercise" of religion.

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (alteration in

original) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)); *see*

U.S. Const. amend. I. A law that burdens religion and is not neutral or generally applicable must

survive strict scrutiny. *Lukumi*, 508 U.S. at 546. That is, the burden on religion "must be justified

by a compelling governmental interest and must be narrowly tailored to advance that interest."

*Lukumi*, 508 U.S. at 531–32. However, "a neutral law of general application need not be

supported by a compelling government interest even when 'the law has the incidental effect of

burdening a particular religious practice. Such laws need only survive rational basis review."

*Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015) (citation modified).

Accordingly, the right to freely exercise one's religion "does not relieve an individual of the

obligation to comply with a valid and neutral law of general applicability on the ground that the

law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 1075

(citation modified).

"In evaluating a Free Exercise claim, the initial inquiry is therefore whether a challenged

law is neutral and generally applicable." *Rosa v. City of Issaquah*, No. C24-1673, 2025 WL

2733672, at *22 (W.D. Wash. Sept. 25, 2025) (citation modified). If it is both, the law must

survive only rational basis review; otherwise, strict scrutiny applies. *Lukumi*, 508 U.S. at 531.

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is

a likely indication that the other has not been satisfied." *Id.*

Plaintiffs allege that the Port's vaccine mandate "denied or abridged the constitutional

rights of the Plaintiffs to the free exercise of religion," and that "Defendants effectively

implemented a vaccine policy from which [they] exempted certain employees based on a secular

criterion—being from an outside police agency—while holding employees who objected to

vaccination on purely religious grounds to a higher standard." Dkt. No. 11 ¶¶ 9.4, 9.9.

Specifically, Plaintiffs allege that Defendant Gerard "falsely den[ied] accommodations" (*id.*

¶ 9.7), and that "at least the in [*sic*] instance of Plaintiff D. Sloan, after he was terminated,

Defendants turned to police officers from neighboring departments to fill the gaps left by those

terminated even though those police officers were not vaccinated" (*Id.* ¶ 9.8).

Plaintiffs concede that HR-34 was neutral, but allege that it was not generally applicable,

and is therefore subject to strict scrutiny. Dkt. No. 14 at 32, 34.

### 1.    Facial Free Exercise Claim

It is not clear whether Plaintiffs are asserting a *facial* challenge to HR-34—that is,

whether they are alleging that the *text* of the policy "in a selective manner impose[s] burdens

only on conduct motivated by religious belief" or otherwise "compels the conclusion that

suppression" of religious practices is its "object," as would show that the policy, on its face, is

not generally applicable. *Lukumi*, 508 U.S. at 543, 534.

This Court has already considered the text of HR-34 (and, for that matter, HR-32) and

determined that the policy does not *on its face* violate the Free Exercise Clause because it is

neutral and generally applicable, and because it is rationally related to a compelling government

interest. *Moriarty v. Port of Seattle*, No. C23-1209, 2024 WL 4290279, at *5–6 (W.D. Wash. Sept. 25, 2024).

The Court determined that both HR-34 and HR-32 are generally applicable because they "apply with equal force to all Port employees . . . , there is no discriminatory animus or objective . . . , [and they] do not prohibit religious conduct while permitting secular conduct that undermines the objective of preventing the spread of COVID-19 in a similar way." *Id.* at *5 (citation modified).[8] The Ninth Circuit, in discussing (and upholding) another COVID-19 vaccine mandate, similarly found it "generally applicable, as it facially applies to all relevant employees unless they can show that they are legally entitled to an exemption." *Bacon v. Woodward* (*Bacon I*), No. 22-35611, 2024 WL 3041850, at *1 (9th Cir. June 18, 2024). Because HR-32 and HR-34 are facially neutral and generally applicable, they are subject to rational-basis review, which both policies survive because they are "rationally related to Defendant's legitimate interest in ensuring that its employees are protected from the transmission of COVID-19." *Moriarty*, 2024 WL 4290279, at *6. The Supreme Court has held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020), and courts in this Circuit have found that mask and vaccine mandates for government employees are rationally related to that interest. *See, e.g., Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1031 (9th Cir. 2025) (vaccine mandate); *Bacon I*, 2024 WL 3041850, at *1 (vaccine mandate); *Rosa*, 2025 WL 2733672, at *26 (vaccine mandate); *Reynolds v. Saddleback Valley Unified Sch. Dist.*, No. 24-02016, 2025 WL 1114015, at *5 (C.D. Cal. Mar. 4, 2025) (mask mandate); *Brock v. City of Bellingham*,

---

[8] The existence of religious exemptions in the language of a policy does not undermine its neutrality or general applicability. *Rosa*, 2025 WL 2733672, at *22–23; *Schmidt v. City of Pasadena*, No. C21-8769, 2023 WL 4291440, at *13 (C.D. Cal. Mar. 8, 2023); *UnifySCC v. Cody*, No. C22-1019, 2022 WL 2357068, at *6 (N.D. Cal. June 30, 2022). "In fact, HR-34 in particular expressly accommodates employees with religious objections by allowing them to seek an exemption from the vaccination policy." *Moriarty*, 2024 WL 4290279, at *5.

No. C24-850, 2025 WL 254725, at *10 (W.D. Wash. Jan. 21, 2025) (vaccine mandate);

*Moriarty*, 2024 WL 4290279, at *6–7 (mask and vaccine mandates, collecting cases).

Plaintiffs do not make any arguments that would challenge these determinations, and their allegations are consistent with an as-applied challenge of HR-34, not a facial one. *See* Dkt. No. 11 ¶¶ 9.1–9.12. This is especially clear given their reliance on *Bacon v. Woodward* (*Bacon II*), 104 F.4th 744 (9th Cir. 2024). In *Bacon II*, the Ninth Circuit reversed and remanded a district court's dismissal of an as-applied Free Exercise challenge in an opinion considered in more detail below. *See infra* Section III.C.2. Under the facts pleaded in the complaint at issue in that case, however—which Plaintiffs argue are "are directly on point" (Dkt. No. 14 at 33)—the Ninth Circuit, in an unpublished, companion opinion to the opinion on which Plaintiffs rely, upheld the district court's dismissal of the firefighters' facial Free Exercise claim, finding it facially neutral and generally applicable. *Bacon I*, 2024 WL 3041850, at *1. The same is true here.

Accordingly, to the extent, if any, that Plaintiffs bring a facial challenge of HR-34 as part of their Free Exercise claim, this challenge fails as a matter of law. Because there are no facts Plaintiffs could plead that would state a claim for relief, any facial Free Exercise claim is DISMISSED WITH PREJUDICE.

### 2.    As-Applied Free Exercise Claim

A facially neutral and generally applicable policy can still be subject to strict scrutiny if it is not implemented in a manner that is neutral and generally applicable. Here, Plaintiffs allege that—as applied to them—HR-34 was not generally applicable because "Defendants effectively implemented a vaccine policy from which it [*sic*] exempted certain employees based on a secular criterion—being from an outside police agency—while holding employees who objected to vaccination on purely religious grounds to a higher standard." Dkt. No. 11 ¶ 9.9. In support of

1    this claim, Plaintiffs point to the Ninth Circuit's reasoning in *Bacon II*, 104 F.4th 744, which

2    they aptly summarize as follows:

3              In *Bacon*, the City of Spokane terminated unvaccinated firefighters
              with religious exemptions that they refused to accommodate.
4              Spokane then turned to firefighters from neighboring fire
              departments to fill the gaps left by the firefighters' departure even
5              though those firefighters were unvaccinated, either having been
              granted an accommodation by their fire department or never
6              having been required to be vaccinated. The Court concluded that
              Spokane exempted certain firefighters based on a secular reason
7              (being from a neighboring department) while holding their
              firefighters, who objected based on religious reasons, to a higher
8              standard.

9    Dkt. No. 14 at 33 (internal citations omitted) (citing *Bacon*, 104 F.4th at 742, 758).

10           Plaintiffs argue that "Defendants took the exact same actions as the City of Spokane"

11   because "Defendants denied Derek Sloan's religious accommodation and then filled his position

12   with police officers from neighboring police departments who were not vaccinated or had been

13   accommodated." *Id*. However, Plaintiff D. Sloan does not assert a First Amendment claim. Dkt.

14   No. 14 at 25. And, although the complaint alleges that after Plaintiff D. Sloan was not

15   accommodated, Defendants "hired police contractors who were not vaccinated to do his exact

16   job," this is not consistent with the factual allegations. Dkt. No. 11 ¶ 3.21. Plaintiff D. Sloan's

17   responsibilities "included patrolling, traffic stops, traffic control at the airport, and responding to

18   calls at Sea-Tac Airport." *Id*. ¶ 3.69. By contrast, Plaintiffs alleged only that the Port contracted

19   "officers from outside agencies [who] worked outside on traffic control," and, once, "had

20   officers from multiple surrounding agencies there in support" as the Crowd Management Unit

21   prepared for a protest. *Id*. ¶ 3.84, 3.85. Even given Plaintiffs' allegation that officers in both

22   groups were unvaccinated (*id*. ¶¶ 3.87–3.89), none of this supports an inference that officers

23   employed by contactors or other police departments were given the same responsibilities or

24   access as Plaintiff D. Sloan or otherwise "filled his position" despite their unvaccinated status.

Of the two Plaintiffs who do assert a First Amendment claim, neither alleges that Defendants "filled [their] position[s] with police officers from neighboring police departments who were not vaccinated or had been accommodated."

### a)    *Jennifer Olivia Sloan*

Plaintiffs assert in reply that "unvaccinated police officers used the conference centers where Jennifer Sloan worked" (Dkt. No. 14 at 33), but this fact is not alleged in the complaint. "In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. California Dep't. of Corr*. 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (citing 2 *Moore's Federal Practice,* § 12.34[2] (3d ed.) ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).")). Even if well-pleaded, however, this additional fact would not support a plausible claim that the Port's vaccine mandate was not generally applicable. The Conference Center was available to be rented for public events (Dkt. No. 11 ¶ 3.86), and the presence and vaccination status of an employer's "customer base and others outside of its employ does not undermine mitigation efforts *within its workforce* or its stated goal of protecting health and safety." *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309 n.9 (D. Haw.  2022) (considering Title VII claim). There are no facts in the SAC to suggest that, though generally applicable on its face, the Port's vaccine policy was not generally applicable as applied to Plaintiff J. Sloan or her position as Business & Marketing Manager. Therefore, the Court DISMISSES this claim by Plaintiff J. Sloan without prejudice. Plaintiff J. Sloan will be allowed to amend her complaint with regard to this claim if she believes she can assert facts to support it.

1

2
    ***b)  Kelly Wolf***

3
    Plaintiff Wolf, however, has pleaded facts similar to those pleaded by the plaintiffs in

4
*Bacon*. The SAC alleges that, after she was terminated from the Port, "the first job offer Plaintiff

5
Wolf received was with a Port contractor, where she would perform the exact same job as before

6
but as a contractor, without being required to be vaccinated." If true, this suggests that, for at

7
least some period of time, the Port turned to contractors to provide a worker or workers to "fill

8
the gaps left by [Plaintiff Wolf's] departure." *Bacon II*, 104 F.4th at 751. By the logic of the

9
majority in *Bacon II*, if the duties previously performed by Plaintiff Wolf were allowed to be

10
performed by workers who were permitted to work fully remotely and unvaccinated based on the

11
secular criterion of being employed by a contractor—while Plaintiff Wolf was not allowed the

12
same arrangement as an accommodation for her religious objection to COVID-19 vaccination—

13
Plaintiff Wolf may be able to sustain her claim that, as applied to her position, the Port's

vaccination mandate was underinclusive and not generally applicable. *See* 104 F.4th at 753.

14
    Defendants counter that (1) EX-29, the policy applicable to contactor employees, was

15
implemented shortly after Plaintiff Wolf's termination, and "phased implementation of the

16
vaccine policies for Port employees and Port contractors' employees does not compel the

17
conclusion that 'comparable secular groups' were treated more favorably"; and (2) "[i]f

18
anything, contractors were treated less favorably than employees with religious objections,"

19
because they were not allowed any religious exemptions. Dkt. No. 16 at 13. But these arguments

20
are unconvincing. The Court need not decide now whether "phased implementation" of a policy

21
for different groups amounts to unequal treatment (a question neither Party has briefed), because

22
Port employees and contractor employees were ultimately subject to different policies.

23
Contractor employees who worked fully remotely did not *need* to request a vaccine exemption,

24
as the Port did not require them to be vaccinated. Dkt. No. 13 at 169–174 (Policy EX-29). If an

unvaccinated worker, subject to EX-29 instead of HR-34, was allowed to work remotely while Plaintiff Wolf was not, then that worker was, in at least one important respect, treated more favorably than Plaintiff Wolf. Whether such a "comparable secular" worker really existed and was treated more favorably overall are fact-intensive questions that cannot be resolved on the pleadings alone. And, in any event, at the motion to dismiss stage, the Court must accept as true all facts alleged in the complaint. *DaVinci Aircraft,*, 926 F.3d at 1122.

Accordingly, Plaintiff Wolf has plausibly pleaded that the Port's vaccine policy was not generally applicable as applied by Defendants to her position. If the policy was not generally applicable, strict scrutiny applies. *Lukumi*, 508 U.S. at 546. While Plaintiffs concede that HR-34 "states a compelling government interest" (Dkt. No. 14 at 34), they also suggest less restrictive means of accomplishing the same goal, such as allowing unvaccinated employees to perform their jobs fully remotely (*see* Dkt. No. 11 ¶ 3.22) or subjecting them to the "fleeting physical presence" rule eventually applied to workers employed by contractors (*see id.* ¶¶ 3.20, 5.12). "At this stage, we accept as true the allegation that these steps would have furthered the . . . compelling interest of stopping the spread of COVID-19." *Bacon II*, 104 F.4th at 753. Under *Bacon II*, Plaintiff Wolf's well-pleaded allegation that the vaccine policy was underinclusive, along with the suggestion of these less restrictive means, suffice to state a claim that the Port's policy, as applied, does not survive strict scrutiny. In sum, the SAC includes facts showing that the City's application of the Proclamation to Plaintiff Wolf was not narrowly tailored. Thus, it plausibly alleges a violation of the Free Exercise Clause as to Plaintiff Wolf.

//

//

//

//

#### IV.    CONCLUSION

Accordingly, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion is denied as to Plaintiff Wolf's as-applied challenge Free Exercise challenge, and granted as to all other claims. It is hereby ORDERED:

(1)    Plaintiff Hall's first cause of action is DISMISSED WITH PREJUDICE.

(2)    Plaintiffs' second cause of action is DISMISSED WITH PREJUDICE.

(3)    Plaintiffs' third cause of action is DISMISSED WITH PREJUDICE.

(4)    Plaintiffs' fourth cause of action is DISMISSED WITH PREJUDICE.

(5)    As to Plaintiffs Wolf and J. Sloan's fifth cause of action:

    (a)    Plaintiffs' facial challenge, if any, is DISMISSED WITH PREJUDICE.

    (b)    Plaintiff J. Sloan's as-applied challenge is DISMISSED WITHOUT PREJUDICE.

(6)    If Plaintiffs intend to file a third amended complaint, they SHALL do so no later than October 30, 2025.

Dated this 30th day of September, 2025.

Tana Lin
United States District Judge